is Ross v. First Financial Corporate Services, Appeal No. 22-2081. Mr. Brown. Good morning. May it please the Court, my name is Kevin Brown. I represent Mr. Ross. This case boils down to this particular issue. The central issue of the case and the application of the 2017 Commission Plan, which changed the commissions on certain parts of the lease transaction, boils down to whether the origination of the lease is a single transaction or the origination of the lease and the customer's subsequent election of one of the end-of-the-lease options is a separate transaction. The reason that is the critical issue to this case is because the 2017 Commission Plan altered the commissions payable to the salespeople on those end-of-the-lease transactions when they were elected by the customer. The district court ruled that they were a separate transaction. It's our position that the origination of the lease is the only transaction involved here for these reasons. It's the lease that contains the provision that provides that at the end-of-the-lease, the customer has a choice, three choices, returning the equipment, buying the equipment, or continuing the lease. Additional commissions are paid if the customer buys the equipment or continues the lease. I gather it's entirely up to the customer whether to, the choice among those options? That's correct. And that's where the gravy is for the defendant? Correct. Okay. Because the commissions are higher at that point because... Well, it's the gravy for both sides. Well, right. Both sides of this case. Right. The salesperson and the... Right, because the capital cost of the equipment has been paid at that particular time. So this is basically all profit. Now, you have to read that lease provision within the context of the commission plans here. The 2010 to 2015 commission plans state that these are the commissions that are going to be paid on new lease originations for first financial court. If you look at each one of those commission plans, it starts off defining each types of equipment and the commissions that will be paid on those. Then it states that on these end of the lease elections, which they call a margin transaction, it's the commission that's going to be paid there. So if you're a salesperson, you look at it and say, okay, when I originate a lease in this particular year for this equipment, I'm going to get this. And then when the customer exercises that option, that's the commission I'm going to be paid. Now, the 2016 commission plan was different, but the defendant admits that it was functionally the same as those earlier commission plans. In the 2017 plan, they changed the commissions on those end of the lease transactions by reducing them until the salesperson reached the quota, the threshold in which they are going to be paid. So when you read those two together, it's the origination of the lease that creates the opportunity when the customer executes the end of the lease option for the salesperson to use those additional or receive those additional commissions. I understand how you are reading the 2017 commission plan. You know, it not only introduced this new quota system, but it also changed the percentage of the commission you could get after the margin transaction. Right. But is your argument that your reading of how the 2017 commission plan works was the way it also worked 2010 through 2015? Or is your reading a reading confined to the 2017 commission plan? I guess I don't understand the... This idea that you really earn the commissions when the lease is originated. That's the core of your idea. Right. Is that also your argument about how it worked from 2010 to 2015? 2010 to 2016. Well, 2016 is kind of a non-issue. Right. That's the way it worked according to the language of the commission plan that said these are the commissions you receive on your lease originations. And the problem or the issue that I have is under the lease, the exercise of those end of the lease options is merely a servicing of the lease. Is the sales representative expected to do any encouragement of the customer to take one of those options to extend the lease or buy out the equipment? Yes. They certainly have to go back to the customer and within the company that was, I believe it was called the remarketing phase of the lease. So, I mean, I guess I'm having trouble understanding in what sense the commissions on the margin transactions are earned at the time of the original transaction as opposed to when the customer undertakes the margin transaction. Because they only arise because of the provision within the lease. So, it's the sales of the lease that create the opportunity when the customer exercises that option. But there's no certainty. Yes. If. It's not a when. So, can I ask you, what are the individual defendants doing in this case? They were named because of the wage payment and collection act issue where they would be personally liable if they knowingly didn't pay the wages or compensation that was due. I've got a very basic question I'm afraid I need to ask. Did Mr. Ross, was he, the customers he's talking about are the folks who actually operate the medical equipment or the other devices? Correct. Okay. All right, thanks. And what are we to make of the language in the sales employment agreement about what it means for a transaction to be closed? It defines a closed transaction as, you know, after we've gotten our money, after, you know, after this thing is done. That's true, but that is or describes the origination of the lease. The closing of the origination of the lease transaction. There's certainly additional paperwork that's done when the end of the lease option is elected. But it's, again, it's the origination of the lease because it talks about the acquisition of the equipment and the financing, et cetera. Could you address the defense argument that the plaintiff, Mr. Ross, accepted these changes by continuing to work in 2017, particularly even if he was reluctant, even if he's protesting under the Illinois cases? And I think that that is determined by whether it's a retrospective change in the commission plan or a prospective change. If it's retrospective, then his signature is not an acceptance of the plan because there has to be additional consideration in order for it to be effective. And I'll reserve the rest of my time for rebuttal. Sure. Thank you. Mr. Rudd. Good morning, Your Honors. Jeffrey Rudd on behalf of the appellees. I do agree with my opposing counsel that there really is a singular issue in this case. And the singular issue is were the commissions for the margin transactions at issue earned in 2017 or at the inception of the initial underlying leases? If they were earned in 2017, then First Financial was free to modify the terms of its commission plans. And Mr. Ross's continued employment and execution of the 2017 commission plan provides a requisite consideration and acceptance for the modification. Mr. Rudd. Yep. I understand your position and the district court obviously accepted that. Yep. I'd like to ask you about the email that Mr. Slevin sent to Mr. Ross on February 14th with the new plan. Yep. At that point, presumably Mr. Ross had been working in 2017 and had been earning commissions, right? Yep. Okay. The first sentence or second sentence of that email says, you will not be paid commissions until this is signed and received by management. Why is that not a clear violation, a threat to violate the Illinois Wage Act? Well, I guess that raises two points that are implicit in that. The first point is whether or not Mr. Ross earned commissions between January 1 and 2017 and when the commission plan was announced in February of 2017. Is there any doubt that he did? That's not in the record at all. They've never argued that he earned commissions in 2017 prior to that commission plan being announced. Is the business so lumpy that somebody could go six weeks without earning any commissions? It depends upon the nature of the margin transaction. I'm talking about any transactions. Yeah. There's possible that there's month-to-month end-of-lease continuations that are margin transactions. No, no. You're saying, Slevin is telling him you will not be paid commissions. Correct. Correct. Right? New transactions, margin transactions, anything. You're saying he didn't earn any commissions between January 1 and February 14? That's simply not in the record, Your Honor. Is it at all probable? It's possible. I don't know for certain. Let's suppose it's possible. It seems to me it would be a very unusual business if it weren't very likely. Hold on. I look at this and this looks like, are there criminal sanctions available under the Illinois Wage Payment Law? I believe there are misdemeanor sanctions under the Illinois Wage Payment and Collection Act. So, threatening not to pay somebody unless they agree to this change? Not to pay amounts already earned? If he threatened not to pay amounts that were already earned, then that would potentially be a violation of the Illinois Wage Payment and Collection Act. But that has never been argued by Mr. Ross at the district court or on appeal. So, this is an issue that has been waived by Mr. Ross in its entirety. It is not something that I think is appropriately addressed on appeal because we never had a chance to address that issue at the district court because it was never raised. Is it defensible? Huh? Is that kind of a threat defensible? It's perfectly fine. If commissions were not yet earned, it is perfectly fine to say you have to abide by this commission plan. That actually arose in one of the decisions. I have no disagreement with you about prospective changes to commission plans. He's free to walk away, etc. That's familiar and well established. But I have never, in practice or on the bench, seen this kind of a threat to try to get somebody to sign a new plan. You can fire him, but you can't refuse to pay him. I would agree with you, Your Honor. If there were earned commissions between January 1 and February of 2017. But that's a more complicated issue because the commission plans at issue in this case were only in effect from January 1 of their respective years to December 31 at the end of that commission year. So, what transpired between January 1 and when that email is sent is, quite frankly, an unknown issue in this case because it was never argued by Mr. Ross. And I would contend that there is a distinct possibility. Although, again, this was not an argument I was able to develop because it was never an argument made by Mr. Ross that no commissions were earned between January 1, 2017 and when the email was issued because the prior commission plans had ended. And so, it was an open issue as to what the next commission plan would be. So, your theory would be that there's no commission plan in place for the first six weeks of the year? That very well could be, Your Honor. But, again, this was not an argument that was developed at the lower court nor one that has been raised on appeal by Mr. Ross. Who bore the risk of a lessee failing to pay in this case? Well, in this particular case, I believe the record is clear in a number of areas that if a lessee did not pay for a margin transaction, then the company would not profit and Mr. Ross would not receive a commission. Matter of fact, that's kind of our core argument is that Mr. Ross, at the end of a lease term, had to do work to convince the customer to engage in a margin transaction. So, does a margin transaction, from your perspective, represent a new lease or a continuation of an ongoing lease? Regardless of the four options, just regarding the option to return the equipment. Right. Of the remaining three options, is that a new lease or a continuation of an old lease? It can be a few things and it doesn't have to be a lease at all. So, the three options are that they agree to extend the lease, which can be on different terms, that they can continue the prior existing lease on a month-to-month or quarter-to-quarter basis, or there is no lease transaction at all and the customer buys the equipment at the end of that period. So, we view it as a completely separate transaction that is negotiated at the end of the lease. And it has to be negotiated at the end of the lease because the customer can simply return the equipment. So, there is still work that needs to be done in order to secure that transaction. And if that work is not done, First Financial doesn't profit from the margin transaction and Mr. Ross doesn't receive a commission for the margin transaction. And I think it's also worth noting, Your Honors, that it is undisputed that commissions for margin transactions of any kind only become payable after the lease reaches threshold, which is the point near the end of the lease when First Financial has recouped most of its costs and a margin transaction becomes profitable. That is something that Mr. Ross conceded in his summary judgment papers. And moreover, Mr. Ross conceded that with respect to the sale of equipment, that the margin transaction and the commissions are not payable until the customer pays for that equipment. So, it's well understood that there needs to be a moment in time at the end of the lease, be it for an extension of the lease or for a purchase, that a transaction needs done. And Mr. Ross admitted in the summary judgment statement of facts in response to it that he is not entitled to commissions for those margin transactions until those later periods occur. Either the customer pays for the equipment or later at the end when the lease has reached threshold. It's certainly not at the beginning of the initial lease. And I would also note that in addition to that, there was language in the commission plans with respect to month-to-month and quarter-to-quarter leases that they will not be credited and paid. I'm sorry, that they will be credited and paid on receipt of payments from the leasee based on excess margin over the threshold amounts. So, we have a very clear record that whatever kind of margin transaction we're dealing with, an extension of the lease or the purchase of the equipment, that the commissions are not payable until the money is paid by the customer and that amount exceeds the threshold, what's required to make the transaction profitable for First Financial. There are no further questions? Thank you, Mr. Brad. Thank you. Mr. Browder. I think the problem with the argument might be better framed this way. The lease is sold. The company's got to acquire the equipment and has to get the financing in place. So, the original paperwork to sell the lease would be done with the salesman at the beginning. Would it not be a breach of the commission plan and the employment agreement if they changed the commission structure in between the date of the sale and when the paperwork is in place? Similarly, on these end-of-lease transactions, the same circumstance arises with the election of a month-to-month or quarter-to-quarter extension of the lease. The salesman convinces the client to exercise that particular lease option. The month-to-month payments start, but they haven't reached the threshold. The company realizes that we're a month away from the threshold. We're going to change the commission structure a month before that date happens and reduce it after that. That's why we believe that it's the origination of the lease and an extension, which is merely the paperwork to extend it, are all part of the original transaction and that that makes any change retrospective in nature. And on that basis, we'd ask that the court reverse the district court opinion. Would you agree, Mr. Brown, that the February 14th email assumes that the company owes Mr. Ross some commissions at that point? Yes. And like I said, on that basis, we'd ask you to reverse the district court's opinion or ruling on the defendant's motion for summary judgment and grant Mr. Ross's motion for summary judgment. Thank you. Thank you, Mr. Brown. And the case will be taken under advisement in the courtroom.